IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRUCE W. B.,[1]           )
                          )
       Plaintiff,         )
                          )
vs.                       )  Civil No. 18-cv-1310-CJP[2]
                          )
COMMISSIONER OF SOCIAL    )
SECURITY,                 )
                          )
       Defendant.         )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in March 2015, alleging disability beginning on July 3, 2013. After holding an evidentiary hearing, ALJ George M. Bock denied the application in a written decision dated June 9, 2017. (Tr. 20-30). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition pursuant to 28 U.S.C. § 636(c). See, Doc. 10.

1

1. The ALJ erred in giving significant weight to the opinion of state agency reviewer LaVerne Barnes, D.O., because she did not review significant medical evidence.

2. The RFC assessment was not supported by significant evidence because the ALJ ignored relevant medical evidence that post-dated the date last insured.

### **Applicable Legal Standards**

To qualify for DIB a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered

> conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539

(7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Bock followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB only through December 31, 2015. The ALJ found that plaintiff had severe impairments of osteoarthritis and edema of the left knee, and degenerative disc disease of the cervical spine with left sided radiculopathy status post fusion surgery. These impairments did not meet or equal a listed impairment.

The ALJ found that plaintiff had the following residual functional capacity (RFC):

> he could lift, carry, push, and pull ten pounds frequently and twenty pounds

occasionally, sit for six to eight hours out of an eight-hour workday, and stand and walk for a total of six hours out of an eight-hour workday with normal breaks. He should not kneel, crawl, or climb ladders, ropes, or scaffolds. He should not work at unprotected heights or be exposed to industrial vibration. He should not perform work above shoulder level. He could only occasionally push and pull with the left arm. He could not forcefully grasp with this left upper extremity, but ordinary manipulation is not limited. He should not repetitively work with his left arm and hand, but he could occasionally use his left arm and hand.

(Tr. 23-24).

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work. However, he was not disabled because he was able to do other jobs which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1965. He turned 50 years old in 2015. (Tr. 206). He alleged disability arising out of cervical fusion and hardware placement, bilateral knee edema, limited head movement, numbness and tingling in his hands, muscle atrophy, and loss of muscle strength. He said he stopped working in September 2014. He had worked as a bar owner, a concrete truck driver, and a self-employed barber tool sharpener. (Tr. 201-211).

In a Function Statement submitted in April 2015, plaintiff said that he could not turn his head in a full range of motion, could not lift more than 30 pounds, and

could not stand for more that a half hour at a time. He did some light household chores such as dusting and dishes, with breaks. He made simple meals like sandwiches and frozen foods. He used a bone stimulator daily. (Tr. 217-224).

2.   **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in February 2017. (Tr. 38).

Plaintiff testified that he sharpened scissors part-time. He worked only one day a week, for two or three hours. The sharpening machine was in his vehicle. He drove to beauty supply places and sharpened the scissors there. He was unable to do this work full-time because he had a cervical fusion that failed; he had nerve damage down his left arm. He must lay down and rest two or three hours a day. He could not stand for long periods of time. (Tr. 41, 44).

Plaintiff's testimony was directed to his condition at the time of the hearing and not to the period before the date last insured, December 31, 2015. (Tr. 45-51).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question based on the ultimate RFC assessment. The VE testified that this person could not do plaintiff's past work, but he could do unskilled jobs at the light exertional level that exist in significant numbers in the national economy. (Tr. 51-58).

3.   **Medical Treatment**

On July 3, 2013, the alleged date of disability, a cervical MRI showed broad-based disc protrusion at C4-5 and C5-6 with moderate canal stenosis and a

broad-based protrusion at C6-7 with high-grade canal stenosis. (Tr. 295).

Plaintiff was seen by Dr. Nicholas Poulos on July 8, 2013. Plaintiff said he had been injured at work about four years earlier. Since then, he had pain in his neck going into his left shoulder and down his left arm. He had no strength in his left hand and his fingers were numb. Dr. Poulos recommended surgical decompression. (Tr. 338-339). Plaintiff returned to the office in January 2015. He had "held off" because he did not have insurance, but he now had coverage. A cervical myelogram was done. Based on that study, Dr. Poulos recommended discectomy with interbody fusion and plate stabilization at C4-C7. (Tr. 338-345).

Dr. Poulos performed the surgery on March 3, 2015. (Tr. 366-367).

On May 28, 2015, plaintiff told Dr. Poulos that his neck and left arm pain were 50% better. He had completed physical therapy. Interval x-rays showed his implants and hardware were well-positioned. He was using an external bone stimulator four hours a day. Dr. Poulos released him to return to work driving a concrete truck with no restrictions. The doctor was "very happy with his progress." (Tr. 376-377).

A cervical x-ray was done on August 11, 2015. This study showed stable appearance of anterior fusion with no acute hardware or osseous abnormality. This x-ray was ordered by Dr. Poulos, but the medical records do not contain a note of a visit with Dr. Poulos around that time. The clinical history in the x-ray report states "status post C4 C7 fusion. Persistent pain and numbness in the left arm and hand." (Tr. 406-407).

On Dr. Poulos' referral, Dr. Naseer administered trigger point injections in

the left trapezius muscle and the cervical region in September 2015. (Tr. 480).

On November 12, 2015, an EMG and nerve conduction study showed chronic left C5, C6 and C7 radiculopathy. This study was done on a referral from Dr. Poulos. The clinical history in the report states, "Left arm pain and numbness." (Tr. 414).

Dr. Poulos saw plaintiff on November 30, 2015. Plaintiff said that the trigger point injections "did not help at all." Plaintiff complained of numbness, tingling, and pain. He said that using his left hand caused cramping that went up the arm and got worse the more he did with his hand. Dr. Poulos stated, "Interval history includes return of pre-operative complaints." Plaintiff was taking Mobic and Robaxin, as well as Norco prescribed by his primary care provider. Dr. Poulos reviewed the x-rays from August 2015 and noted that they showed the implants and hardware were well-positioned and he had great disc height. He remarked that these x-rays "do not identify a definitive pain generator." He also noted that it was "[d]ifficult to assess fusion however appears to have early trabecular bone." Dr. Poulos also wrote, "On exam at recent office visit, Phalen's test provokes left-sided neck and shoulder pain. Left-sided Apley scratch test provokes pain that involves the forearm. Negative empty can test. Posterior neck and shoulders tight musculature on palpation."[3] He noted that a recent nerve conduction study showed chronic left C5, C6 and C7 radiculopathy but no peripheral neuropathy. Dr. Poulos noted that plaintiff "unfortunately" continued

---

[3] The record does not contain a note from this "recent office visit."

to smoke. The risk of pseudoarthrosis was again discussed.[4] The assessment was left arm pain. Dr. Poulos recommended a "cervical CT myelogram to evaluate fusion as well as residual stenosis." The note states "Need Information - Financial Authorization" for the myelogram. He was to return in 1 month. (Tr. 476-478).

There are no further records from Dr. Poulos.

In April 2016, an MRI of the cervical spine showed no significant spinal canal stenosis. There was facet hypertrophy resulting in multilevel foraminal narrowing at C3-C7. This study was ordered by plaintiff's primary care provider, Dr. James Hitchcock. (Tr. 447-448).

Plaintiff saw a doctor at Barnes Jewish Hospital for a "second opinion for posterior fusion" in December 2016. The doctor's name does not appear in the record. He told the doctor that he was worse since his surgery. Plaintiff had "followed up with Dr. Poulos, who suggested what sounds like a posterior cervical decompression and possibly a fusion." On exam, his strength was 5/5 throughout except for some give-away weakness of the deltoid, biceps and triceps on the left due to pain. He had "some mild trace weakness" of his left grip. He had normal muscle bulk and tone. Sensation was intact to light touch, pinprick, and proprioception except for subjectively decreased pinprick in a C6 distribution on the left. He had limited range of motion on flexion, extension, and rotation of the neck due to pain and stiffness. Range of motion of the lumbar spine was normal.

---

[4] "A spinal fusion procedure has as a goal to obtain a solid bone bridge between two or more levels of the spine. It may take months and sometimes over a year to obtain a solid fusion. When this does not occur, and bone never completely grows across an area of intended spinal fusion, then one calls this a 'non-union' or pseudarthrosis." http://www.orthospine.com/index.php/home- mainmenu-1/13 #pseudarthrosis, visited on March 27, 2019.

He had mild pain to palpation of the cervical midline and paraspinous muscles. X-rays showed solid fusion at C4-5 and C5-6, but there was a nonunion at C6-7 with some residual angular excursion as well as some very mild backout of one of the C7 screws. The doctor told him that he needed to quit smoking and that smoking was complicating his healing. They discussed possible surgery. The doctor said that, "If indeed we were to consider surgical intervention, I believe a posterior approach would be reasonable to address his C6-7 nonunion." The doctor said that, if he were to do the surgery, he would require at the very least a cervical MRI and a post-myelography CT scan. Plaintiff was "not particularly interested in surgery at present." It was unclear whether he was going to return to Dr. Poulos. The doctor said he would see him on an as-needed basis. (Tr. 472-473).

4. **State Agency Consultant's RFC Assessments**

In December 2015, state agency consultant LaVerne Barnes, D.O., assessed plaintiff's RFC based on a review of the record. (Tr. 76-78). As is relevant here, she concluded that plaintiff was able to occasionally lift up to 20 pounds and frequently lift up to 10 pounds. He was limited to occasional pushing/pulling with the bilateral upper extremities. He had no manipulative limitations.

## Analysis

Both of plaintiff's points relate to the ALJ's apparent failure to consider any of the medical evidence that post-dated December 31, 2015, particularly the December 2016 x-rays showing non-union at C6-7.

As defendant correctly argues, plaintiff must establish that he was disabled as of the date last insured (December 31, 2015) to be eligible for DIB. See,

*Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). However, medical evidence from after the date last insured may be relevant to that issue, and the ALJ is required to "consider *all* relevant evidence, including the evidence regarding the plaintiff's condition at present." *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010), as amended on reh'g in part (May 12, 2010).

ALJ Bock did not mention the medical evidence that post-dated the date last insured, including the visit with the doctor at Barnes Jewish who concluded that an x-ray showed nonunion at C6-7. Defendant argues that "Even if Plaintiff experienced post-surgical changes in his cervical spine in December 2016, that does not mean those limitations existed as of December 2015." Doc. 26, p. 8. This rationalization does not carry the day.

Defendant's argument is premised on her after-the-fact analysis of the medical evidence. She concludes that the nonunion and screw backing out were not present as of December 31, 2015, because the August 2015 x-ray showed that plaintiff had a stable post-surgical cervical spine. Doc. 26, p. 8. Defendant's conclusion is likely incorrect; the August x-ray report did not address union and Dr. Poulos said it was "[d]ifficult to assess fusion" on that film. He wanted a "cervical CT myelogram to evaluate fusion as well as residual stenosis." He discussed the risk of pseudoarthrosis with plaintiff. (Tr. 476-478). Dr. Poulos' note from December 2015 strongly suggests that defendant's interpretation of the medical evidence is incorrect; Dr. Poulos himself was unable to determine that union had occurred, and he recommended further studies to investigate that question. The ALJ's interpretation also fails to consider the nature of a nonunion

in that it assumes that the nonunion at C6-7 was a postsurgical change that occurred after December 31, 2015.

Aside from being likely incorrect, defendant's argument is a violation of the *Chenery* doctrine because it relies on a rationale not advanced by the ALJ. It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision...." *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010).

The problem here is that the ALJ did not consider whether the later medical evidence was relevant to plaintiff's condition before the date last insured, as he should have done. *Parker,* 597 F.3d at 925. Obviously, the state agency reviewer could not have considered the later evidence, so her opinion cannot substitute for a review by the ALJ.

The ALJ's discussion of Dr. Poulos' November 2015 note was remarkably brief. He noted only that plaintiff reported continued left arm numbness and tingling and also reported some improvement with medication. (Tr. 26). The ALJ said nothing about Dr. Poulos' statement that it was difficult to assess fusion based on the recent x-ray and his recommendation that a CT myelogram be done to investigate fusion. While the ALJ is not required to mention every piece of evidence, he "simply cannot recite only the evidence that is supportive of [his] ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record." *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). The ALJ is required to "engage sufficiently" with the medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). Had ALJ Bock done so here, he

would have recognized that Dr. Poulos himself was uncertain whether fusion had occurred as of November 2015 and he continued to warn of the risk of pseudoarthrosis. The ALJ erred by failing to consider the relevance of the later medical evidence, particularly in light of Dr. Poulos' November 2015 note.

The Court must conclude that ALJ Bock failed to build the requisite logical bridge between the evidence and his conclusions. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: March 28, 2019.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**